UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CALVARY TEMPLE ASSEMBLY OF GOD,

    Plaintiff,

v.                                                   Case No. 06-C-1148

THE CITY OF MARINETTE, WISCONSIN,

    Defendant.

**DECISION AND ORDER**

Calvary Temple Assembly of God ("Calvary") filed this lawsuit alleging that the City of Marinette ("the City") violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, as well as its rights under the United States and Wisconsin Constitutions, when it refused to grant Calvary's application for a special exemption to city land use regulations. Calvary sought an exemption from the city zoning code to permit it to operate a faith-based counseling center for members of its church and the general public at 3041 Parkdale Drive, Marinette, Wisconsin, ("the Parkdale Drive Property"). Calvary had acquired the property, which is adjacent to the land on which its church and "fellowship hall" are located, as a single-family residence. The City determined that Calvary's proposed use of the land would make it a "professional office," a use not permitted under the City's zoning code for that district. The City therefore concluded that it lacked authority to grant Calvary's application and refused to consider it. The case is now before the Court on cross-motions for summary judgment. For the reasons that

follow, Calvary's motion for summary judgment will be denied, and the City's motion for summary judgment will be granted.[1]

**BACKGROUND**

The City of Marinette is a municipal corporation located in Marinette County, Wisconsin, and organized under the laws of Wisconsin. (DPFOF ¶ 6.) The City has established a comprehensive zoning code under the authority granted by § 62.23(7) of the Wisconsin Statutes. (DPFOF ¶ 11.) Its purpose is "to promote the health, safety, morals, prosperity, aesthetics, and general welfare of this community." Marinette Muncipal Code (MMC) § 13-1-1(b). One of the ten zoning districts established by the zoning code is a "One-and-Two Family Residence District," known as an "R-2 district." (DPFOF ¶ 14.) The purpose and use of the R-2 Residential District are described as follows:

> (a) PURPOSE. The R-2 Residential District is intended to provide for moderate density single family and two family residential development served by municipal sewer and water facilities. This district is intended to provide a quiet, and pleasant area protected from traffic hazards and the intrusion of incompatible land uses.
> (b) USE. In a One and Two Family Residence District no building or premises shall be used, and no building shall be erected or structurally altered after July 7, 1959 except for one or more of the listed permitted, principal uses, permitted accessory uses, or special exceptions.

MMC § 13-1-11.

(DPFOF ¶ 17.) Thus, land use within such a district is restricted to only "listed" principal and accessory uses, or, upon successful application, "listed" special exceptions.

---

[1] Calvary Temple has also filed a motion to amend its brief in opposition to the City's motion for summary judgment, as its original document was mislabeled. This motion will be granted.

According to the code, the permitted principal uses of land within an R-2 district are limited to single or two family dwellings, community living arrangements with a capacity of eight or fewer persons as provided in Wis. Stats. § 62.23 (7)(2), and family day care for not more than eight (8) children as provided in Wis. Stats. § 66.304. (*Id.*) "Professional offices" are not among the principal uses in R-2 districts, although they are permitted principal uses in four other zoning districts in the City. (DPFOF ¶ 24.) MMC § 13-1-11(d) sets forth six permitted accessory uses of land in an R-2 district.[2] (*Id.*) Professional offices qualify as one such permitted accessory use, but only if they comply with the "home office" definition under MMC § 13-1-3(68), which provides:

> (68) Professional Office. The office of a doctor, practitioner, dentist, minister, architect, landscape architect, professional engineer, lawyer, author, musician or other recognized profession. When established in a residential district, a professional office shall be incidental to the residential occupation, not more than twenty-five percent (25%) of the floor area of only one (1) story of a dwelling unit shall be occupied by such office and one (1) unlighted nameplate, not exceeding one (1) square foot in area, containing the name and profession of the occupant of the premises shall be exhibited.

(DPFOF ¶ 21.)

---

[2] Zoning Code § 13-1-11(d) provides for the following permitted accessory uses:
(1) Accessory buildings or one (1) private garage when having the same or greater setback from the front lot lines as the main building; provided that the accessory buildings together with the main building do not cover more than forty percent (40%) of the ground area of the lot or building site.
(2) Not over two (2) boarders or lodgers not members of the family.
(3) Professional offices as defined in Section 13-1-3.
(4) Professional or announcement signs as permitted by the City's Sign Ordinance, Chapter 3 of the Marinette Code of Ordinances.
(5) Home occupations as defined in Section 13-1-3, not involving the conduct of a business on the premises.
(6) Uses customarily incident to any of the above uses when located on the same lot and not involving the conduct of a business.
(DPFOF ¶ 17.)

3

MMC § 13-1-20 recognizes that "there are certain uses which, because of their unique characteristics, cannot be properly classified as unrestricted permitted uses in any particular district or districts," but are more appropriately considered on a case-by-case basis. (DPFOF ¶ 19.) MMC §§ 13-1-20 through 13-1-39 govern the application and review of applications for such "special exceptions."[3] (DPFOF ¶ 18.) MMC § 13-1-11(e) lists the eight potential special exceptions to the code's restrictions on land use in an R-2 district.[4] Although churches are among the listed possible exceptions under § 13-1-11(e), professional offices are not. "Professional buildings" are, however, one of the possible special exceptions for land use in an R-3 "multi-family residence" district. (DPFOF ¶ 23.)

---

[3] For example, § 13-1-26 lists eight findings the city Plan Commission must make in order to grant an application for one of the possible special exceptions. Such findings include the adequacy of utilities and other site improvements for the proposed use, that the proposed use would not defeat the purpose of the zoning district at its location, and that the value of neighborhood property would not be substantially impaired or diminished.

[4] MMC § 13-1-11(e) provides for the following special exceptions:
(1) Community Living Arrangements with a capacity of nine (9) to fifteen (15) persons as provided.
(2) Mortuaries and funeral homes.
(3) Two Family Dwellings on Substandard Lots - Section 13-1-11(f)(5).
(4) Churches, public and parochial schools, colleges and universities, including dormitories, public libraries, public museums, art galleries, and municipal parking lots.
(5) Municipal buildings, except sewage disposal plants, garbage incinerators, public warehouses, public garages, public shops, and storage yards and penal or correctional institutions and asylums. Public recreational and community center buildings and grounds.
(6) Telephone offices, exchanges and lines and static transformer stations, provided there is no service garage or storage yard.
(7) Bed and Breakfast Establishments - Residential.
(8) Family Day Care Home for Nine (9) or More Children.
(DPFOF ¶ 17.)

4

Calvary, a Wisconsin nonprofit corporation, owns real property located at 3036 Carney Avenue, Marinette, Wisconsin ("the Carney Avenue Property"). (DPFOF ¶ 1.) Located on the Carney Avenue Property is Calvary's main church building in which it conducts religious services, and a fellowship hall for church-related social gatherings, meetings and youth activities. (DPFOF ¶ 27.) Both buildings and their operations are authorized as special exceptions under the zoning code. Calvary purchased the adjacent Parkdale Drive Property in March 2004. (DPFOF ¶ 28.) At all times relevant, both the Carney Avenue and Parkdale Drive Properties have been located within an R-2 district under the zoning code, and Calvary Temple was aware of this when it purchased the Parkdale Drive Property. (DFPFOF ¶¶ 29, 32.)

On April 19, 2005, Calvary's Senior Pastor Timothy Hawthorne filed an application for a special exception with the City of Marinette for what he indicated was a proposed use of the Parkdale Drive Property as a "church office," and for "counseling professional services." (DPFOF ¶ 35.) The application stated, "[t]he Professional Counseling ministry of the Church would use the house." (*Id*.) On May 12, 2005, Pastor Hawthorne presented the special exception application to the Marinette City Plan Commission ("the Commission") during the Commission's regular public meeting, and explained Calvary's proposal to convert the Parkdale Drive Property into "New Hope Wellness Center," a facility where Calvary would, among other things, provide counseling services to its members and the general public based on a sliding fee scale. (DPFOF ¶¶ 36, 38, 39.) An attorney for Calvary also appeared at the meeting, and told the Commission that RLUIPA would apply to Calvary's application and its proposed use of the Parkdale Drive Property. (DPFOF ¶ 40.) The Commission postponed action regarding the application to seek the advice of counsel, and to allow Calvary to submit a legal brief to the Commission in support of its application. (DPFOF ¶ 42.)

On June 3, 2005 Calvary's attorney submitted a legal memorandum stating Calvary's position on the special exception request and the application of RLUIPA to the request. (DPFOF ¶ 43.) In August 2005, the city attorney issued a fourteen page legal opinion to the Plan Commission regarding Calvary's request and the application of RLUIPA. (DPFOF ¶ 44.) The opinion set forth the city attorney's conclusion that the Commission lacked the authority to grant Calvary's application because the proposed professional office was not among the special exceptions allowed for land use in an R-2 district. (DPFOF ¶ 45.) The opinion also concluded that denial of the application would not violate RLUIPA. (*Id.*)

After Calvary brought its application to the attention of a new mayor of Marinette, the issue was placed on the agenda for the Planning Commission's meeting of July 13, 2006. (DPFOF ¶ 48.) However, the issue was later removed from the agenda. A new city attorney informed Calvary's attorney by letter that the application had been removed from the agenda because the Commission had no legal authority under City ordinances to take further action regarding the application because the special exception being sought was not one of the authorized special exceptions allowed in an R-2 district. (DPFOF ¶¶ 50-51.)

Calvary filed the instant action in November 2006, alleging that by refusing to consider its application, the City violated Calvary's rights under RLUIPA, 42 U.S.C. §§ 2000(a)-2000(b), the First and Fourteenth Amendments of the United States Constitution, and Article One Sections One and Eighteen of the Wisconsin Constitution. (Compl. 7-12.) After the City filed its motion, Calvary conceded that it cannot meet is burden of proof as to its claim that the City violated the "equal terms" provision of RLUIPA under 42 U.S.C. § 2000(b), and that it failed to serve the written notice of claim required to maintain its state law claims. (Calvary's Am. Br. Opp. Summ. J. 6-7.)

6

Accordingly, these claims will be dismissed. What remains are Calvary's claims that the City has violated the "substantial burden" provision of RLUIPA (42 U.S.C. § 2000(a)), and the Free Exercise and Equal Protection Clauses of the United States Constitution.

**ANALYSIS**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

**I. RLUIPA**

Calvary claims the City violated RLUIPA by refusing to grant its application for a special exception to its zoning ordinance so that it can use the single-family home it acquired as a religious counseling center. In pertinent part, RLUIPA states:

7

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). RLUIPA defines the exercise of religion broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Moreover, Congress has mandated that RLUIPA "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

In failing to grant its application for an exception, Calvary contends that the City has substantially burdened its religious exercise of providing counseling services which is motivated by its religious mission.[5] (Calvary's Br. Supp. Mot. Partial Summ. J. 8-9.) And because it has no compelling interest in preventing the operation of its counseling center on its Parkdale Drive property, Calvary argues that the City's refusal to grant its application is unlawful under RLUIPA.

As an initial matter, the City questions whether the counseling services Calvary seeks to provide at its proposed counseling center constitute a "religious exercise" within the meaning of the Act. Although the City concedes that the provision of faith-based counseling may generally constitute a "religious exercise," it argues that operating a "fee-charging counseling office, open to not only . . . members [of the church], but advertised to members of the general public" is not

---

[5] The parties do not dispute that the City's enforcement of its zoning code constitutes an "individualized assessment" involving a "land use regulation" for jurisdictional purposes under RLUIPA. (Calvary's Br. Supp. 6-7; City's Br. Opp. 2.)

protected activity under RLUIPA. (City's Br. Opp. Partial Summ. J. 7.) To hold otherwise, the City argues, would require it to provide similar accommodations to other entities who claimed to offer similar faith-based professional services, such as faith-based legal services or financial advice. And since counseling centers, law offices and financial advisors who did not claim to be faith-based would be excluded, such an interpretation could run afoul of the Establishment Clause. (*Id.* at 8 (citing *Kaufman v. McCaughtry,* 419 F.3d 678, 683 (7th Cir. 2005).)

Though the City's argument may have some merit, it is not necessary to decide this issue under the circumstances of this case. Even assuming that the operation of a "for fee" counseling center open to the general public does constitute the exercise of religion, Calvary is unable to demonstrate that the City's failure to grant an exception to its zoning ordinance amounts to a substantial burden. Before reaching that issue, however, it is first necessary to address Calvary's argument that it's proposed use of the site is not prohibited under the City's zoning ordinance.

Calvary disputes the City's definition of its proposed center as a "professional office," and thus challenges the relevancy of land use regulations concerning such structures. (Calvary's Resp. to DPFOF ¶ 51.) But it is clear from the undisputed evidence that Calvary's proposed wellness center falls within the definition of a professional office. MMC § 13-1-3(b)(68) defines "professional office" as "[t]he office of a doctor, practitioner, dentist, minister, architect, landscape architect, professional engineer, lawyer, author, musician or other recognized profession." Calvary concedes that its New Hope Wellness Center would be staffed by licensed counselors, who would receive financial compensation for their services and resources. (Jackson Dep. 75:18-25, 76:1-11, 85:12-20, November 19, 2007.) Pastor Jackson, who would be primarily responsible for the development of the center's activities and offerings (*Id.* 72:9-17; Hawthorne Dep. Nov. 19, 2007,

9

20:18-21:3) testified as to his intention to advertise the wellness center and Calvary's counseling services in the same manner as other therapists and counselors in the community, such as through the use of newspaper articles, business cards, signage, and pamphlets. (Jackson Dep. 80-82.) He also spoke of being contacted by another therapist interested in joining "the firm," (*Id*. 86:14-15) and indicated his hope that the center would offer services both by appointment and during regularly scheduled office hours. (*Id*. 73:17-21.) Pastor Jackson stated his hope was that the New Hope Wellness Center would provide a more professional office atmosphere than Calvary was then using for its counseling services, and would be portrayed as such. (*Id*. 54:8-14.) Pastor Hawthorne likewise indicated that Calvary anticipated having a "permanent 'professional' setting at which counseling services could be provided," (Hawthorne Decl. ¶ 10) and that the "Professional Counseling ministry of the Church would use the house." (DPFOF ¶ 35.) Based on the uncontroverted testimony of Pastor Hawthorne, it is clear that the proposed use of the Parkdale Drive Property falls within the definition of a "professional office" under the city zoning code.

It is also undisputed that Calvary did not intend to have anyone reside in the house and limit the space to be used to provide counseling services to 25% of the building. (DPFOF ¶ 40.) From this, it likewise follows that Calvary's proposed use of the building does not qualify as a "home office" within the meaning of the city zoning code. Thus, the proposed counseling center does not fall within the listed permitted principal or accessory uses of the land allowed by MMC § 13-1-11, or the special exceptions listed in MMC § 13-1-20. While Calvary describes its application as proposing "an accessory use of the Church" and its existing "campus," MMC § 13-1-3(2) defines "accessory use" as "[a] use of land or a portion of a building customarily incidental to the actual principal use of the land or building and located on the same parcel or property with such principal

10

use." Here, the proposed center would not be located on the Carney Avenue Property, where Calvary's church and campus are located. Thus, it does not qualify as an accessory use on that parcel.

Since the applicable land use regulations in this case prohibit the establishment of a professional office such as the New Hope Wellness Center within an R-2 district, the question that remains is whether this restriction imposes a substantial burden upon Calvary. In *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003), the Seventh Circuit applied RLUIPA's "substantial burden" provision in the context of requests by an association of Chicago area churches and five of its individual member churches for special use permits under the City's land-use regulation. The plaintiff churches claimed that the City's zoning ordinance violated RLUIPA's "substantial burden" provision by requiring them to obtain special use permits in order to establish a church in any of the non-residential districts of the City. *Id.* at 755. They argued that the scarcity of affordable land available for development in R zones, along with the costs, procedural requirements, and inherent political aspects of the approval processes for special use permits, imposed a substantial burden on the free exercise of religion within the meaning of RLUIPA. *Id.* at 761. But while the Court acknowledged that the conditions plaintiffs cited may have made the religious exercise of their members more difficult, it rejected plaintiffs' claim that the burden created by the City's zoning code was substantial. *Id.*

In reaching its decision, the *Civil Liberties* Court specifically addressed the meaning of "substantial burden" in RLUIPA. Although the text of RLUIPA contains no express definition of the term "substantial burden," the Court noted that the Act's legislative history "indicates that it is to be interpreted by reference to RFRA [Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-

11

2000bb-4] and First Amendment jurisprudence." 342 F.3d at 760. Given the definition of "substantial burden" adopted by the Court in those other contexts and RLUIPA's broader definition of religious exercise, the Court noted that the phrase "'substantial burden on religious exercise' could be read to include the effect of any regulation that 'inhibits or constrains the use, building, or conversion of real property for the purpose of religious exercise.'" *Id.* at 761 (quoting *Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996)). The Court rejected such a construction, however, noting that "[a]pplication of the substantial burden provision to a regulation inhibiting or constraining any religious exercise, including the use of property for religious purposes, would render meaningless the word 'substantial,' because the slightest obstacle to religious exercise incidental to the regulation of land use—however minor the burden it were to impose—could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means." *Id.* Instead, the Court held that "in the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable." *Id.*

Based upon this definition of "substantial burden," the *Civil Liberties* Court concluded that the plaintiffs' claim failed:

> we find that these conditions—which are incidental to any high-density urban land use—do not amount to a substantial burden on religious exercise. While they may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city, they do not render impracticable the use of real property in Chicago for religious exercise, much less discourage churches from locating or attempting to locate in Chicago.

12

*Id.* The Court found it significant that each of the five individual plaintiff churches had managed to find locations within Chicago's city limits. That they expended considerable time and money to do so did not, in the Court view, entitle them to relief under RLUIPA's substantial burden provision. "Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations." *Id.* at 762. "[N]o such free pass for religious land uses," the Court held, "masquerades among the legitimate protections RLUIPA affords to religious exercise." *Id.*

Subsequent cases confirm *Civil Liberties*'s approach. In *Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846 (7th Cir. 2007), for example, the Court rejected a church's claim that a zoning ordinance that excluded churches from industrial zones violated RLUIPA's substantial burden provision. In so ruling, the Court noted that "[t]he ban on churches in the industrial zone cannot in itself constitute a substantial burden on religion, because then every zoning ordinance that didn't permit churches everywhere would be a prima facie violation of RLUIPA." *Id.* at 851. While religious organizations might enjoy such unlimited freedom, the Court observed that "denying them so unusual a privilege could not reasonably be thought to impose a substantial burden on them." *Id.* The requirement that a substantial burden be shown insures that religious groups are not completely immune from neutral land-use restrictions. And "[w]hen there is plenty of land on which religious organizations can build churches (or, as is common nowadays, convert to churches buildings previously intended for some other use) in a community, the fact that they are not permitted to build everywhere does not create a substantial burden." *Id.*

13

Likewise, in *Vision Church v. Village of Long Grove*, 468 F.3d 975 (7th Cir. 2006), the Court rejected a RLUIPA substantial burden challenge to the denial of a church's application for a special use permit to allow construction of a church complex on its property. The church in that case alleged that the village had improperly imposed several conditions on its approval of a conditional use permit, including limitations on future development, on use of a particular outdoor area, and on Sunday and weekly activities. Applying the test it had adopted in *Civil Liberties*, the Court rejected the plaintiff's claim that the religious exercise of its members was substantially burdened, concluding instead that the limitations imposed "no more than incidental burdens on the exercise of religion." *Id.* at 999. In the words of the Court, "a burden must be more than a mere inconvenience to rise to the level of a constitutional injury; it must place 'significant pressure' on Vision to 'forego religious precepts' or to engage in 'religious conduct.'" *Id.* (quoting *Midrash Sephardi*, 366 F.3d 1214, 1227 (11th Cir. 2004)).

It is under these principles that Calvary's claim must be assessed. Calvary argues that disallowing the establishment of the center at its Parkdale Drive Property imposes a substantial burden on its religious exercise for two reasons: (1) Calvary lacks the financial resources to purchase property for a counseling center elsewhere (Calvary's Br. Supp. 12; Hawthorne Decl. ¶ 28.), as it has already made a substantial financial investment in the Parkdale Drive Property (PPFOF ¶ 11) and knows of no alternative buildings available for a reasonable price (Calvary's Br. Supp. 10; Hawthorne Decl. ¶ 26), (2) the location adjacent to the church would be convenient for counselors and clients alike (Jackson Dep. 58:19-25), and would facilitate recognition that the center was a ministry of the church. (Jackson Dep. 59:25-60:6, 90:3-14; PPFOF ¶ 38.) Each will be addressed in turn.

14

### 1. Alternative Sites

The Seventh Circuit has held that "[t]he existence of alternative sites . . . is relevant [] when a zoning ordinance is challenged as imposing a 'substantial burden' on religious uses of land," *Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007), and a religious organization may show that "a paucity of other land available" has made the exclusion of a religious use of land from a zoning district a substantial burden. *Petra Presbyterian Church*, 489 F.3d at 851. Here, Calvary has offered no evidence of such a paucity of other available land. In fact, according to Michael Minzlaff, the city assessor and building inspector for the City of Marinette, "[b]oth at the time Calvary purchased the Parkdale Avenue residence and currently, there were and are many other residential homes and other buildings available for purchase that are located in zoning districts such as B-1, B-2, and B-3, in which professional offices can be located under the zoning code." (Minszlaff Affidavit ¶¶ 1,7.)

Calvary cites *Living Water Church of God v. Charter Tp. of Meridian*, 384 F. Supp. 2d 1123 (W.D. Mich. 2005), and *Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005) for the proposition that a land use regulation which imposes delay, uncertainty, and expense may amount to a substantial burden of religious exercise. (Calvary's Br. Supp. 12.) It claims to have experienced such delay, uncertainty and expense with regard to its application to establish the New Hope Wellness Center. But *Living Water Church of God* has been reversed in an unpublished decision, *see Living Water Church of God v. Charter Tp. of Meridian*, 258 Fed. Appx. 729 (6th Cir. Dec 10, 2007). And *Sts. Constantine and Helen* is readily distinguishable in that the religious organization in that case had a reasonable expectation that it would be granted the permit it sought and was arbitrarily denied those permits. Thus, the

15

court held that to require the church to search around for other parcels of land or continue filing applications in spite of the city's unreasonable actions, though not an insuperable burden, was enough to constitute a substantial burden. *Sts. Constantine*, 396 F.3d at 901. Here, by contrast, Calvary had no reasonable expectation that it would be allowed to establish a professional office at its Parkdale Drive Property. Calvary admits that at the time it purchased the property it knew it was within an R-2 district. (DPFOF ¶ 32.) Thus, having decided to purchase the property anyway, Calvary "assumed the risk of having to sell the property and find an alternative site." *Petra Presbyterian Church,* 489 F.3d at 851.

Nonetheless, Calvary argues that requiring it to secure an alternative location for its proposed center would be financially infeasible, and thus a substantial burden. But it offers no evidence, other than the conclusory statements of its pastor, to support such a claim. (Hawthorne Decl. ¶ 28.) The City, on the other hand, has presented evidence in the form of an affidavit by the City Assessor/Building Inspector that there were at the time Calvary purchased the Parkdale Drive Property, and still are, many comparable residential homes and other buildings available for purchase in close proximity to Calvary's church in zoning districts that allow professional buildings. (Aff. of Michael Minzlaff ¶¶ 6, 7, Ex. K.) Calvary has offered no evidence that securing a different location for its counseling offices, whether by lease or purchase, would be so financially onerous as to render it "effectively impractical." *Civil Liberties*, 342 F.3d at 761. Even if it were, RLUIPA does not require municipal authorities to create exceptions to their land-use regulations for every church that finds it too expensive to comply. *See Love Church v. City of Evanston*, 896 F.2d 1082, 1086 (7th Cir.1990) ("Whatever specific difficulties [plaintiff church] claims to have encountered, they are the same ones that face all [land users]. The harsh reality of the marketplace sometimes

16

dictates that certain facilities are not available to those who desire them."). Here, at worst, the challenged law "simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive." *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961); *see also Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961, 987 (N.D. Ill. 2003) (holding that "monetary and logistical burdens do not rise to the level of a substantial burden"). The fact that Calvary may incur additional expense to sell its Parkdale Drive Property so that it can purchase a property in a district that allows professional offices does not amount to a substantial burden on religious exercise.

Accordingly, Calvary has failed to show that any financial burden resulting from its inability to use its Parkdale Drive Property as a professional counseling office imposed a substantial burden on its religious exercise under RLUIPA.

**2. Convenient Location of the Proposed Site**

Calvary also argues that by preventing it from establishing the New Hope Wellness Center at its Parkdale Drive Property, the City has imposed a substantial burden on its religious exercise, because establishing the center at that location adjacent to the church would facilitate recognition of the center as a ministry of the church, and be convenient for counselors and clients alike. However, "a burden must be more than a mere inconvenience" to constitute a substantial burden. *Vision Church v. Village of Long Grove*, 468 F.3d at 999; *Subil v. Sheriff of Porter County*, 2005 WL 1174218, *4 (N.D. Ind. 2005). The potential inconvenience of counselors and clients of the proposed New Hope Wellness Center is simply not sufficient to constitute a substantial burden.

Similarly, the potential inconvenience of having to find means other than its location by which to inform the public that the center is a part of the ministry of Calvary does not amount to a

17

substantial burden. According to Calvary, "[p]art of the Church's goal in ministering to the general public is to help them by bringing them closer to Jesus, and being associated with the Church is important to that end." (Calvary Am. Br. Opp. 2.) Yet the proposed counseling center could be "associated with the Church" even if it were located elsewhere. Pastor Jackson has admitted that if the center were in another location, but marked so as to indicate it was a part of Calvary Assembly of God, that would be fine, just not as convenient. (Jackson Dep. 60:10-17.) Indeed, Calvary admits that its "ministries and even the church service itself need not be conducted on the church Campus, but are held there for continuity and convenience." (Calvary Am. Br. Opp. 5.) It argues that if the City is allowed to prohibit it from conducting its counseling ministry at the Parkdale Drive Property, in spite of the property's convenience, then "[t]he City could use the same 'convenience' argument to prohibit the Church from conducting *any* of its ministries from the existing Church campus." (*Id*.) This fear is unfounded. The fact that Calvary's proposed counseling center is not permitted by the city zoning code to be located on neighboring property simply does not affect Calvary's ability to use its main campus for its ministries. That the zoning code prevents the establishment of a professional office at the Parkdale Drive Property may be inconvenient, but it does not rise to the level of a substantial burden on Calvary's religious exercise. Accordingly, Calvary's RLUIPA claim fails.

**II. Free Exercise**

The Free Exercise Clause of the United States Constitution, like RLUIPA, "provide[s] that, if a facially-neutral law or land use regulation imposes a substantial burden on religion, it is subject to strict scrutiny." *Vision Church*, 468 F.3d at 996 (7th Cir. 2006). But because the City has not

18

imposed a substantial burden on Calvary's religious exercise, it necessarily follows that Calvary may not succeed on its claim that by refusing to grant its application to establish the New Hope Wellness Center, the City violated the First Amendment. *Id.* ("Given the similarities between RLUIPA § 2(a)(1) and First Amendment jurisprudence, we collapse [plaintiffs'] claims for the purpose of this analysis; this approach seems most consistent with post-RLUIPA case law.") Calvary's First Amendment claim thus also fails.

### III. Equal Protection

Enforcement of an otherwise valid zoning ordinance violates the Fourteenth Amendment's due process and equal protection clauses only if "(1) the decision of the particular zoning body is arbitrary; or (2) if the ordinance is applied or enforced with a discriminatory intent or purpose." *Scudder v. Town of Greendale, Indiana*, 704 F.2d 999, 1002 (7th Cir. 1983) (citation omitted). "A particular decision or action is 'arbitrary' if it is reached 'without adequate determining principle or was unreasoned.'" *Id.* (citation omitted). A reasoned application of a municipal ordinance is therefore not arbitrary. *Id.* at 1002.

Calvary alleges that "[t]he City's decision to refuse to grant the Plaintiff a special exception or otherwise grant the Plaintiff's request to provide faith-based counseling at the subject property is arbitrary, capricious, and without any rational basis." (Compl. ¶ 61.) Specifically, Calvary claims that in spite of recognizing that Calvary may provide counseling at the Parkdale Drive Property, the City refused to consider its special exemption application, thus arbitrarily applying the city zoning code. (Calvary Am. Br. Opp. 6-7.)

However, it is clear that the City did not act arbitrarily in refusing to consider Calvary's application where the city zoning code did not permit professional offices within an R-2 district,

19

even as a special exception, and the proposed use of the land would constitute a professional office. A reasoned application of the city zoning code may distinguish between the present counseling activities occurring at the Parkdale Drive Property and the professional office Calvary hoped to establish. (See Jackson Dep. 80-86) (discussing the limited nature of the present use of the property in comparison with the proposed use if granted a special exemption.) Calvary's Equal Protection claim thus fails as well.

## CONCLUSION

In sum, the City's decision not to consider or grant Calvary's application for a special exemption to establish a professional counseling office has not imposed a substantial burden on Calvary's religious exercise. Therefore, Calvary's First Amendment claim and RLUIPA claim under 42 U.S.C. § 2000cc(a)(1) are dismissed. Because the City's decision was a reasoned application of its zoning code, Calvary's Equal Protection claim is also dismissed. As Calvary has admitted that it cannot meet its burden of proof with respect to its remaining RLUIPA and state claims, these too are dismissed. The City's motion for summary judgment is granted, and Calvary's motion for partial summary judgment is denied. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this   18th   day of July, 2008.

       s/ William C. Griesbach
       William C. Griesbach
       U.S. District Judge